**DRILLING WELL CONTROL, INC.**

v.

**DRESSER INDUSTRIES, INC.**

**Civ. A. No. 68 H 52.**

United States District Court,
S. D. Texas,
Houston Division.

Dec. 21, 1971.

Paul Harris, Lee Larkin, Andrews, Kurth, Campbell & Jones, Houston, Tex., for plaintiff.

W. F. Hyer, Hyer, Eickenroht, Thompson & Turner, Houston, Tex., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

SEALS, District Judge.

This is a suit for patent infringement. The patent in suit is United States Letters Patent No. Re. 26,220 (hereafter "Records patent"). Five claims of the patent are in issue; however, plaintiff has not attempted to establish infringement of claim 13. Claims 4, 18, 20 and 21 remain in issue on the complaint of infringement. In its counterclaim, defendant has asserted invalidity of claims 4, 13, 18, 20 and 21.

The invention of the Records patent is directed to a particular method and apparatus for controlling abnormal pressure conditions, commonly called "kicks", in oil and gas wells being drilled.

When an oil or gas well is drilled, the drill bit makes a hole larger than the drill pipe to form an annulus between the wall of the hole and the drill pipe. It is into this annulus that formation fluids, such as gas, oil or salt water, may flow as the earth's strata are penetrated. To prevent incursions of such fluids during drilling, weighted drilling mud is circulated from the mud pits on the surface, down through the drill pipe, out through the bit, and back up to the surface through the annulus to the mud pits. The drilling mud lubricates the bit and carries the earth cuttings to the surface to keep the hole clean. When the hydrostatic pressure of the column of weighted mud exceeds the pressures of formation fluids encountered, no incursions of the formation fluids into the annulus occurs. Under normal conditions a proper program of weighting the mud will suffice in keeping the hydrostatic pressure of the mud at the proper level.

However, during the drilling of some oil and gas wells, subsurface formations containing abnormally high pressures are sometimes drilled into. When this formation pressure is greater than the drilling mud can restrain, formation fluids run into the annulus, and, since these fluids (especially gas) are of lower specific gravity than the mud, they lighten the mud column and reduce the hydrostatic head of the mud applied to the formation, so that formation fluids can flow at even greater rates into the annulus. This is called a well "kick", and if this incursion is permitted to continue uncontrolled, the formation fluid can eventually force enough of the mud from the hole that the well may blow out.

Prior to 1960, a "kicking" well was controlled by manual manipulation of steel chokes to develop a temporary back pressure on the well. This back pressure was added to the hydrostatic head pressure of the mud so that the effective pressure then applied to the formation was sufficient to stop further intrusion of the lighter fluid from the formation. The drilling mud was then circulated to raise the formation fluids in the annulus to the surface. Mud of sufficiently heavier weight was prepared and pumped into

the well so that it exerted a high enough hydrostatic head to hold back the formation fluids when the back pressure was removed and the well returned to normal drilling. This is called "killing" a well. Although many wells were saved by these procedures, many were lost, because mud replacement is time consuming and, unless choke manipulation developed the proper back pressure during this interval, the well could be so overpressured that the walls of the hole would collapse and the well would be lost. Conversely, the well might be so underpressured that gas invasion would continue and the well would blow out.

In 1954, Gulf Oil Co., through Mr. T. B. O'Brien and W. C. Goins, Jr., began a study of the well control problem and procedures employed in attempting to kill a "kicking" well. When the results of their work were published in early 1960, the industry was made aware for the first time of what was involved in the well hole during every stage of the well-killing operation. The result of their study was a new method or procedure for controlling a kicking well which made it possible to better utilize the existing steel chokes for this purpose, and to utilize other equipment which later became available. The O'Brien and Goins method is commonly called the constant drill pipe pressure method. Its principal teaching is to ignore changes in the volume of mud coming into the mud pits and simply maintain the drill pipe pressure of the drilling mud at some selected constant value to control the well. The mud pumping rate is also maintained constant and the steel chokes are chosen to be of a size as to cause a back pressure to be exerted on the well. As a well is being killed, this back pressure must be varied in order to maintain the drill pipe pressure constant. Also, the back pressure on some wells is lowered as heavier mud fills the well. These variations in back pressure are accomplished in the O'Brien method by manipulating the steel chokes to create the desired flow opening. In this manner, the returning mud is "choked" so that, de-pendent upon the rate that the mud is flowing and the amount of choking, the desired back pressure is applied to the well. The steel adjustable chokes used by O'Brien and Goins are still in use today.

Gulf Oil first successfully used the CDPP method in 1958, and O'Brien and Goins published their method for general usage by the trade in early 1960. Since 1960, the O'Brien and Goins' Constant Drill Pipe Pressure method has become the standard in the industry and is employed today in well killing operations which use the patented apparatus of plaintiff (the Stooksberry unit) defendant's accused apparatus (the Swaco choke), or even the prior art steel chokes.

The steel chokes employed by O'Brien and Goins and others in controlling mud flow are generally of two types: positive fixed chokes which have a fixed or constant choking orifice size, and manually adjustable chokes in which the size of the choking orifice can be adjusted by a hand wheel in the same manner that the opening in a water faucet can be adjusted. The returning drilling mud may include free gas entrained in it and this mud can be abrasive since it carries the bit cuttings with it. As this mud with entrained gas passes through a flow restriction such as a choke, the gas expands, the fluid velocity increases and a cutting away of the flow orifice may occur which will require replacement or re-adjustment of the choke. As stated in the plaintiff's patent in suit, Col. 1, lines 56–61, in recognition of this problem:

[I]f gas escapes from a high pressure formation, it becomes entrained in the mud stream and tends to expand as it travels out of the well and passes through a flow device, such as a throttling valve or choke, thereby increasing the abrasive action of the mud stream and subjecting the flow device to excessive wear.

A less serious problem with the steel adjustable choke when employed in the well control method of O'Brien and Goins is that it is manually operated by a hand wheel and the size of the orifice cannot

conveniently be controlled from the rig floor.

In late 1960, Mr. Louis Records conceived a method and improved apparatus for controlling a "kicking" well. Mr. Records' approach to controlling a "kicking well" was not to choke the returning drilling mud with a choke, but to confine returning mud in a pressure vessel in which gas entrained in the mud may be separated out and confined in the same vessel to hold a back pressure on the returning mud. If the pressure of the separated gas gets too low or no gas is separated from the mud, such as when the intruding fluid is salt water, then a supplemental gas (such as nitrogen) from an external source is applied directly in the pressure vessel on top of the body of returning mud confined in the vessel to maintain the necessary back pressure. In the proper usage of Records' apparatus, the gas pressure applied on top of the confined mud (either by the separated well gas or the supplemental gas) plus the hydrostatic pressure of the mud column will be sufficient to kill the well. Since the returning mud, which is at a relatively high pressure, must return to an open mud pit at atmospheric pressure, the mud is "dumped" out of the pressure vessel through a dump valve and drops in pressure. The dump valve also serves to restrict the flow of the drilling mud to permit a quantity of it to accumulate into the pressure vessel ahead of it. The valve is controlled by a float so that the level of mud in the vessel remains substantially constant. It is on this accumulated mud that the gas pressure for controlling the well is directly applied. Because of the separation of the entrained well gas, the mud flow is considerably slowed in passing through the pressure vessel and entrained well gas is separated from the slowed down mud with the result that the dump valve is not subject to the abrasive action of mud travelling at the high velocities caused by expanding unseparated well gas as are chokes, steel or otherwise, which handle both well gas and mud.

Mr. Records first killed a well with his apparatus in late 1961, and the apparatus (a Stooksberry unit) was displayed at the Oil Show in Lafayette, Louisiana in 1961. The plaintiff corporation, Drilling Well Control, Inc., has commercialized the Records invention since 1961. The commercialized embodiment of the Records invention (the Stooksberry unit) utilizes two separator vessels through which the returning mud flows before passing to the mud pits.

In March, 1965, Mr. Phil Griffin, then an employee of Swaco, Inc. of Fort Worth, Texas, was requested by a customer to develop a valve or choke which would hold the necessary back pressure to kill a kicking well and which could be remotely operated. Aware of the abrasive nature of the drilling mud, and having had previous experience with a rubber element which showed resistance to this abrasive action, Mr. Griffin designed a remotely controlled choke including a rubber sleeve choking element. This design resulted in the accused structure, commonly called the Swaco choke. Although Mr. Griffin saw plaintiff's Stooksberry unit at the 1961 Oil Show in Lafayette, Louisiana, his approach to the well control problem was not Mr. Records' approach of confining the well fluid in a pressure vessel and applying an outside fluid directly to the confined fluid, but was to provide an improved choke by replacing the handwheel of the prior art steel adjustable choke with a remotely controlled hydraulic fluid motor, and by replacing the adjustable steel orifice with an adjustable rubber orifice less susceptible to wear from the abrasive action of the mud. In the Swaco choke, the rubber sleeve is constricted to choke the returning drilling mud by a piston which is positioned by an externally controlled hydraulic fluid. Also, prior to 1960, the use of remotely operated rubber sleeve type valves to control the flow of abrasive fluids was well known, and the effect of what Mr. Griffin did with the Swaco choke was to adapt these prior devices to the specific task of controlling returning drilling mud, also an

abrasive fluid, during the well killing operation.

Swaco, Inc. immediately began to commercialize its choke and a description of it was published in a trade journal in August 1965. On November 30, 1967, defendant bought all the Swaco chokes of Swaco, Inc. and has, at all times thereafter, engaged in the sole commercialization of the Swaco choke. Mr. Griffin is now an employee of defendant.

On September 13, 1962, Mr. Records applied for a patent on his well control apparatus and was issued patent No. 3,-213,939 on this application on October 27, 1965. Mr. Records applied for a reissue of his patent on April 4, 1966, and this reissue patent was issued on June 6, 1967, as No. Re. 26,220.

After Mr. Records' patent was reissued, plaintiff heard that defendant was considering entering the well control business, so plaintiff sent a copy of Mr. Records' Reissue Patent to defendant, and offered to discuss licensing defendant to use the invention. Defendant rejected the offer, and entered the well control business without such a license. Plaintiff then brought this suit for infringement.

The case having been tried before the court, and the court having fully considered the testimony of the witnesses and the exhibits introduced into evidence, and the arguments and briefs of counsel, the court now makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. Plaintiff, Drilling Well Control, Inc. (which will hereinafter be referred to as "DWC") is a Texas corporation having its principal place of business at Houston, Harris County, Texas.

2. Defendant Dresser Industries, Inc. (which will hereinafter be referred to as "Dresser") is a Delaware Corporation having a regular and established place of business at Houston, Harris County, Texas.

3. This action arises under the patent laws of the United States and the acts charged to infringe have been carried out by defendant in this District and elsewhere.

4. Plaintiff DWC has, at all times material hereto, been the owner of original United States Letters Patent No. 3,213,-939 and the reissue of the patent, namely United States Letters Patent No. Re. 26,220 (which will be hereinafter referred to as the " '220" patent).

5. When an oil or gas well is drilled, the drill bit makes a hole larger than the drill pipe to form an annulus between the wall of the hole and the drill pipe. It is into this annulus that formation fluids, such as gas, oil or salt water, may flow as the earth's strata are penetrated. To prevent incursions of such fluids during drilling, weighted drilling mud is circulated from the mud pits on the surface, down through the drill pipe, out through the bit, and back up to the surface through the annulus to the mud pits. The drilling mud lubricates the bit and carries the earth cuttings to the surface to keep the hole clean. When the hydrostatic pressure of the column of weighted mud exceeds the pressures of formation fluids encountered, no incursions of the formation fluids into the annulus occurs. Under normal conditions a proper program of weighting the mud will suffice in keeping the hydrostatic pressure of the mud at the proper level.

However, during the drilling of some oil and gas wells, subsurface formations containing abnormally high pressures are sometimes drilled into. When this formation pressure is greater than the drilling mud can restrain, formation fluids run into the annulus, and, since these fluids (especially gas) are of lower specific gravity than the mud, they lighten the mud column and reduce the hydrostatic head of the mud applied to the formation, so that formation fluids can flow at even greater rates into the annulus. This is called a well "kick", and if this incursion is permitted to continue uncontrolled, the formation fluid can eventually force enough of the mud from the hole that the well may blow out.

The drilling mud which is circulated through the drill pipe and up the an-

nulus of the hole is abrasive. When gas enters the annulus from the formation being drilled and mixes with the mud it causes the mud leaving the well to flow at abnormally high velocities. This greatly increases the abrasive action of the mud. One of the serious problems encountered in dealing with well kicks is to adequately control this highly abrasive fluid for the period of time necessary to restore balance between the hydrostatic pressure of the drilling mud and the formation fluid pressure.

6. Prior to 1960, kicking wells were controlled by restricting the outflow of drilling mud from the well with a manually operated steel choke to put a back pressure on the well while mud of sufficiently heavier weight was prepared and pumped into the well. Two types of steel chokes were used: One type is called a positive choke, and is simply a steel nozzle with a fixed orifice size; the other type is called a steel adjustable choke, and is simply a valve having a handwheel which may be turned to enlarge or reduce the opening through the valve. Various techniques, or procedures, for manipulating these manually operated steel chokes were also used. However, prior to 1960, one of the problems in using these chokes or any other well control apparatus was that little was known about what occurred in the hole in a well control operation, and no satisfactory method had been advised for utilizing any of these well control devices. Steel chokes are still used today in well kicking operations; however, because of the abrasive nature of the well fluid, particularly with gas entrained in the mud, they tend to wear out rather rapidly.

7. In 1957, the Oil and Gas Journal published Shell Oil Company's "Drillers Manual on High Pressure Drilling and Blowout Prevention", an exhaustive treatise explaining the problems presented by well kicks and suggesting better techniques for controlling kicking wells. ("High-Pressure Drilling and Blowout Prevention", The Oil and Gas Journal, Oct. 14, 1957, pp. 139–166.) Although the Shell employee (Mr. Frank S. Bell)

who authored this publication did not testify at the trial, it is clear from Shell's sponsorship of the article, the author's qualifications, and extensive bibliography and the credits given by later publications, that the article was the result of extensive research and clearly represents the state to which the well control art had developed by 1957. Bell's suggested technique was to hold a back pressure on the well with a choke and regulate the flow of mud so that the amount of mud coming out of the hole is equal to that being pumped in. The latter was also a common field practice at that time. This technique has not proved workable and was termed by Mr. T. B. O'Brien, one of the acknowledged experts in this field, as a practical impossibility when the well is making gas, a condition that occurs often in a kicking well.

8. In 1954, two employees of Gulf Oil Company, Mr. T. B. O'Brien and Mr. W. C. Goins, began a study of the well control problem. The result of their work, completed in 1958, was the development of what has been called the constant drill pipe pressure method for killing wells. The basis of this method was the use of a choke or other device to hold a back pressure on the returning drilling mud and then varying this back pressure when needed to maintain the drill pipe pressure constant. This method was a significant contribution to the art of well control and was published for general trade usage in March, 1960 and again in June and July, 1960. O'Brien and Goins provided for the first time a method of controlling the drill pipe pressure during the killing operation that permitted safe circulation of mud to bring the well under control, and for the first time explained what was involved in the drill hole during the well-killing operation.

9. Prior to Records' conception of his idea, O'Brien and Goins used the available steel chokes in their method to provide the necessary control by choking the mud flow line to provide a back pressure; they did not suggest apparata such as

are involved in this lawsuit for exercising this control. However, their method of control has become standard in the industry and the plaintiff's patented structure and the accused Swaco choke both are employed in practicing this method to kill a kicking well. Without a suitable method such as provided by O'Brien and Goins, these devices would not in themselves kill a kicking well.

10. Thus prior to Records' conception of his idea, the art of well control had advanced to the point where the control was no longer exercised by attempting to maintain the mud level in the pits at a constant volume (mud input into well equalling mud output), but was exercised by varying the back pressure on the returning mud to maintain a constant drill pipe pressure. O'Brien and Goins prior to Records' conception, varied this back pressure by varying the size of an orifice in a steel adjustable choke. A disadvantage of the adjustable steel choke was that while it could be varied and the well controlled, it was manually operated, and it was not convenient to operate it remotely from the rig floor. However, the most serious shortcoming of these chokes was their tendency to wear out in relatively short periods of time due to the abrasive action of the drilling mud.

11. Also, prior to Records' conception of his idea, various devices for remotely controlling the flow of abrasive fluids were available to the art, as exemplified by the Langstaff, Welker, Norman and Sausa patents (Defendant's Exhibits 27, 30, 29 and 28. For a detailed discussion of these devices see f.f. 27–29. These devices are valves or chokes which restrict or choke the flow of the fluid passing through them, as also does the steel adjustable choke. However, their resistance to wear from abrasive fluids is considerably greater than the steel chokes used by O'Brien and Goins because they use a rubber sleeve for the choking element. Also, in place of the manually operated handwheel of the steel adjustable choke, a remotely controlled fluid motor is provided to adjust the size of the choke opening through the rubber sleeve. However, it was not un-

til defendant introduced the Swaco choke that a device of this type was employed to control drilling mud to kill a well.

12. An adjustable choke controls a well by regulating the flow of an abrasive fluid through the choke by valving or choking the fluid. For this reason, the art of valving or choking an abrasive fluid, whether drilling mud or other abrasive fluid, is the relevant art to be considered in this lawsuit. Therefore, the fact that the Langstaff and other remotely operated rubber sleeve valves were not used in a well killing operation is of little significance and the specific art concerning these devices is highly relevant art. All of these devices are designed for controlling a fluid flowing through them, which may be abrasive. Hydraulically or pneumatically operated rubber sleeve valves were well known prior to 1960 and one of their known characteristics was their greater resistance to abrasive fluids than the metal chokes.

13. In 1960, Mr. Louis Records, the inventor of the '220 patent in suit, who was then a safety consultant to the drilling industry, became interested in the problem of kick control. Mr. Records had had many previous years of drilling experience and was fully familiar with the well kick problem and the fact that manually operated steel chokes had been used to control kicks, with varying degrees of success, for many years.

14. Mr. Records asked numerous experienced drilling and operating people how a well kick could best be controlled and determined that the then best known method was to put the well on a manually operated steel choke to apply back pressure on the well while the mud was weighted up, but that this method was not reliable. He then began an independent study of the problem and, some months later, conceived the idea of the Records patent which he first discussed with a drilling superintendent, Mr. Alton Dishong, late in September, 1960, and later with a drilling consultant, Mr. Stanley Stockstill. Both men told Mr. Records that his idea was very unique and definitely would work. Mr. Records

built a device incorporating his idea, displayed this device at the October, 1961 Oil Show in Lafayette, Louisiana, filed the patent application which finally matured into the '220 patent in suit, and began a business which was incorporated as plaintiff, DWC, in 1963. The commercial form of Mr. Records' invention (the Stooksberry unit) on which this business was based employs two separator vessels connected in series. Plaintiff has built and operated 21 of these units since 1961. Mr. Records testified that he never lost a well with this unit.

15. Mr. Records filed his original application for patent on September 13, 1962, and his original patent issued on October 26, 1965. On April 4, 1966, he filed an application for reissue of his patent and was granted Reissue Patent No. 26,220, the patent in suit, on June 6, 1967.

16. The plaintiff's device, the Stooksberry unit, confines well pressure in a pressure vessel or separator. Returning drilling mud is passed into this vessel and a liquid level controlled dump valve at the mud outlet maintains a body of mud in the lower part of the vessel. A gas pressure is applied directly against the body of mud in the vessel with such gas being derived by separating well gas from the incoming mud or from a supplemental external source. Instead of varying the size of a choke to vary the back pressue on the well, the Records device varies the pressure of the gas in the vessel in direct contact with the mud therein by either bleeding off excess gas pressure when the well produces gas or adding additional pressure when needed from the supplemental source, as when the well is not producing sufficient gas. The Records patent does not teach or show a rubber sleeve choke or remote operation of any well control device.

17. The Records invention, as taught and claimed in the '220 patent, represents a substantial contribution to the art of well control. It provides a unique and reliable method and apparatus for controlling well kicks. The Records invention gives almost infinite control over the range of back pressures that can and must be applied to keep a kicking well under control.

18. The court cannot accept plaintiff's contention that the scope of the contribution Records' invention made to the art is so broad as to include any utilization of an outside fluid pressure to control the back pressure required to hold a well. The scope of the contribution of the Records' invention is limited to its unique structure and mode of operation (including equivalent structures and modes of operation) whereby outside fluid pressure is utilized to perform the intended function. The Records' device performs the same function that chokes perform (maintain drill pipe pressure), but, rather than doing so by utilizing a choking device, it maintains and controls this back pressure by confining returning drilling fluid in a pressure vessel in which gas entrained in the mud may be separated out and confined in the same vessel to impose the desired back pressure on the returning stream of drilling fluid. By initially applying fluid pressure directly against the returning drilling fluid and by allowing entrained gases to separate from the mud before the mud passes through mechanical valves, the velocity of the mud is greatly decreased before it passes through the mechanical valves, thereby substantially reducing the abrasiveness of the mud flow on the metal or solid parts of the well control apparatus. The result is that the Records device lasts longer than the prior art steel chokes and thereby affords superior control over the well. This method of the Records' invention of applying outside fluid pressure directly to the returning drilling fluid, with its concomitant advantages of reducing wear on the well control device and facilitating precise well pressure control, constitutes the scope of the contribution of the Records invention to the art. The evidence also indicates that the Records' invention muffles some of the noise prevalent in a well kick, but this advantage is of incidental value.

19. In March, 1965, prior to issuance of the original Records patent, Mr. Phil Griffin, then an employee of Swaco, Inc.,

was requested by a customer to design a remotely controlled valve for use in controlling a well. Mr. Griffin, drawing upon his past experience with rubber as material that was resistant to abrasion, developed the accused device which is commonly referred to as the Swaco choke. The Swaco choke is an improvement over the prior art adjustable steel chokes in two respects. Instead of the choking orifice being of steel, it is of rubber and is formed by a rubber sleeve which is compressed to adjust the size of the choking orifice extending throughout the sleeve. Also, instead of using a hand wheel to adjust the size of the orifice, a remotely controlled fluid motor is used. The fluid motor includes a piston, the position of which is manipulated by hydraulic fluid to vary the rubber sleeve element. The rubber sleeve element and the fluid motor are mounted in a housing which is connected into the return drilling fluid line and connected to a source of hydraulic fluid for operating the fluid motor. Like the prior art steel chokes, the Swaco device "chokes" the returning drilling fluid to apply the necessary back pressure. Also, like the steel chokes, and unlike Records' device, the amount of back pressure is dependent on the flow rate of the mud. All of the returning mud and well gas pass together and unseparated from each other through the Swaco choke, subjecting it to the same abrasive forces as steel chokes, and the velocity of the drilling fluid increases as the drilling fluid passes through it. Like Records' device, the Swaco choke has proven to be an improved tool for use in the O'Brien and Goins method of well control. However, where the Records device confines the returning fluid by slowing down and permitting a certain amount of it to accumulate in a vessel or chamber where an external gas can be applied directly against the drilling fluid to provide the desired back pressure, the Swaco choke applies this back pressure by choking the returning drilling fluid.

20. The Records' Reissue patent includes 26 claims directed to the disclosed embodiments and a method employing these devices. Only claims 4, 13, 18, 20 and 21 are involved in this lawsuit and plaintiff does not press infringement of claim 13. Only claim 4 of these claims was in the original Records' Patent No. 3,213,939. The claims in suit include three method claims, 4, 13 and 18, and two apparatus claims, 20 and 21. These claims read as follows:

### Claim 4

A method for controlling a well being drilled and having drilling mud circulated therein, said method being carried out when pressure conditions which might cause a blowout are encountered, said method comprising,

passing mud returning toward an open storage pit first through a pressure vessel upstream of the open pit,

introducing pressure gas into the vessel for application of back pressure against the drilling mud contained within the annulus formed by the exterior of the drill pipe and the bore of the well,

said back pressure together with the hydrostatic pressure created by said drilling mud being of sufficient magnitude to maintain the well under control and prevent a blowout through said annulus,

pumping drilling mud of the desired weight into the drill pipe to increase the weight of the drilling mud contained therein and the hydrostatic pressure created thereby,

varying said back pressure in relationship to the hydrostatic pressure created by the drilling mud being circulated into said annulus whereby the hydrostatic pressure of the drilling mud column in said annulus together with said back pressure are sufficient to maintain the well under control during the pumping of said drilling mud and to prevent a blowout through said annulus, and

discontinuing said introduction of pressure gas into the vessel when the hydrostatic pressure created by the column of drilling mud of increased weight in said annulus is sufficient to

again maintain the well under control and prevent a blowout through said annulus.

### Claim 13

The method of controlling pressure in a well bore having a drill string and drilling fluid therein, comprising the steps of:

flowing drilling fluid returning from said well bore into a chamber in closed communication with said well bore; and,

selectively flowing another fluid directly into said chamber under a pressure of predetermined magnitude to impose a predetermined back-pressure on said returning drilling fluid.

### Claim 18

The method of controlling pressure conditions in a well having a drill string and drilling mud therein comprising the steps of:

passing drilling mud into the well and

then through a chamber connected in fluid-tight communication with said well;

exerting back pressure against the drilling mud in the well

by selectively introducing a pressurized fluid directly into a portion of said chamber while passing the drilling mud therethrough, with the pressure level of said pressurized fluid selected such that the back pressure plus hydrostatic head pressure in the well is sufficient to keep the well under control;

increasing the specific gravity of the drilling mud being introduced into the well when formation pressure increases to thereby increase the hydrostatic head pressure in the well; and

varying the pressure level of said pressurized fluid to thereby vary said back pressure to compensate for said changes in head pressure and formation pressure.

### Claim 20

An apparatus for controlling pressure in a well bore having a drill string and drilling fluid therein, the combination of:

a chamber having inlet and outlet means:

means for delivering drilling fluid returning from said well bore into said chamber;

means containing a pressurized source of another fluid; and,

means for selectively delivering said other fluid directly into said chamber and generating a back pressure on said returning drilling fluid.

### Claim 21

An apparatus for controlling pressure in a well bore having a drill string and drilling fluid therein, comprising:

a generally cylindrical member forming a chamber therewithin having inlet and outlet means;

means connected with said well for delivering returning drilling fluid under pressure into said chamber;

means containing a pressurized source of another fluid; and,

means for selectively delivering said other pressurized fluid directly into said chamber and thereby generating a back pressure on said returning drilling fluid.

21. The construction and scope to be given to the terms "chamber" and "vessel" as they variously appear in the claims is a major issue in this lawsuit. Plaintiff contends that these terms should be construed broadly enough to encompass any such element into which is passed both a drilling mud and an outside source of fluid to apply a back pressure on a well in order to control kicks without regard as to whether gas separation is occurring, whether the two fluids are in direct contact with each other, or whether the generation of back pressure is by one mode or another. All that plaintiff would require is that the two fluids be in the vessel or chamber and that a back pressure be applied to a drilling well. Defendant contends that these terms must be construed to mean a chamber or vessel having substantially the same characteristics and functions as the one shown in the Records patent so that there can be gas separation, two fluids in direct contact with each other and,

most important, so that there is a substantial identity of mode of operation with that shown in the patent. The claims and these terms must be interpreted in the light of the patent disclosure.

In the disclosure, these terms are used to describe an element (termed a "vessel" in the disclosure) in which a body of returning mud is accumulated, primarily for two purposes. First, when the well is making gas, the accumulation decreases mud velocity and permits separation of the free well gas so that it acts directly on the body of mud to generate a back pressure on the well. Second, when the well is not making gas, the accumulation of mud permits the application of an outside gas directly to the body of mud to generate such back pressure. In both cases, the vessel serves to confine both the gas and mud (and hence the well pressure) in such a way that the body of accumulated mud prevents the escape of the pressure gas through the mud outlet which is necessary to avoid loss of control of the back pressure in the disclosed embodiments. It also serves to permit the pressure gas to be added to or bled from the upper part of the vessel separately from the mud so that the gas can exert its desired pressure independently of the rate that the mud is flowing into and out of the vessel. In view of these teachings of the patent, these terms cannot be given a construction to cover an element through which the mud flows without accumulation as it would flow through a simple passage such as a pipe or similar conduit.

22. At the trial of this cause, defendant introduced, and its expert, Mr. Wiley Noble, discussed, the following prior art references:

1) DX–25 Cross U.S. Patent No. 1,-847,864, issued 3/1/32;

2) DX–15 Article by K. R. Teis "Pressure Completion of Wells in Fitts Pool", API—Drilling Practice, 1936;

3) DX–27 Langstaff U.S. Patent No. 2,518,625, issued 5/11/46;

4) DX–30 Welker U.S. Patent No. 2,-917,269, issued 6/20/58;

5) DX–29 Norman U.S. Patent No. 2,-735,642, issued 6/8/51;

6) DX–28 Sausa U.S. Patent No. 2,-590,215, issued 3/25/52;

7) DX–13 and DX 14 O'Brien and Goins articles on the Constant Drill Pressure Method; and

8) DX–22A and DX 22B The Hydril Blowout Preventor — Composite Catalog 1958–1959, pp. 2590 and 2591.

Also, plaintiff's expert, Dr. Pennington, testified that the use of remotely operated rubber sleeve valves for controlling the flow of abrasive fluids was well known in the art prior to 1960.

The Cross and Teis references were introduced to show the state of the art prior to 1960 with respect to the specific apparatus of the patent in suit. The O'Brien and Goins articles and the four rubber sleeve valve patents DX–27, –28, –29, –30) were introduced to show the invalidity of the claims in suit when these claims are construed to read on the Swaco choke and its use in the O'Brien and Goins method. The Hydril reference was introduced to establish invalidity of method claim 13 by illustrating its overly broad scope. Defendant contends that because of the Cross and Teis references, the Records' invention is a limited improvement over the prior art; that because of the remotely operated rubber sleeve valve patents, the apparatus claims of the Records patent cannot be validly extended to cover the defendant's Swaco choke which employs the basic principles disclosed in these references; and that the method claims of the Records patent cannot be validly extended to include the method practiced by those who use the defendants' Swaco choke, which method is the use of a prior art remotely controlled rubber sleeve choke in the prior art method of O'Brien and Goins.

23. The inventor of the Records device did not knowingly and willfully make any misrepresentation to the United States Patent Office by failing to bring pertinent prior art known to him to the attention of the patent examiner during

the prosecution of either his original or reissue patent, on the basis of which misrepresentation the United States Patent Office issued either the original Letters Patent No. 3,213,939 or reissue Letters Patent No. Re. 26,220. However, none of the prior art references listed in the preceding Finding of Fact (No. 22) were cited during the prosecution of the patent in suit or the original Records patent, and these references are pertinent to the matters in issue in this lawsuit.

24. In 1932 Mr. Roy Cross disclosed (U.S. Patent 1,847,864, DX–25) a device for maintaining back pressure on circulating drilling fluid as it comes from the well to prevent formation gas from blowing out the drilling fluid during drilling. The returning drilling fluid is passed into a separator vessel, accumulates in the vessel to a level where it is discharged into a mud pit through a valve which can be adjusted to give the desired back pressure on the well. Cross' disclosure teaches that this valve may be automated. At the top of the vessel, a drain-off pipe and valve is provided through which gas which accumulates in the top of the vessel may be taken off to relieve excessive pressures. Cross' disclosure does not teach the application of an external fluid pressure to supplement the gas pressure in the top of the separator vessel and does not talk of controlling well kicks. However, Cross was concerned with holding a back pressure on the drilling fluid returning from the well.

25. In 1932, Mr. K. R. Teis published an article entitled "Pressure Completion of Wells in the Fitts Pool" in API— Drilling Practice (DX–15). This article describes a system of pressure drilling whereby external gas pressure is added to the drilling fluid before the drilling fluid is introduced into the drill pipe. The system utilizes a separator vessel to remove water and gas from the drilling fluid as it returns from the well annulus. The Teis method controls back pressure by placing chokes in the flow lines between the well and the separator. The subject matter of Mr. Teis article was before the Examiner in the Foran patent (PX–22) and Mr. Records amended his reissue claims to distinguish over these references by specifying that his external gas pressure be added *directly* into the separator vessel instead of *indirectly* as in Teis and Foran.

26. The "Cross" and "Teis" references relate to pressure drilling and not kick control. However, in both situations, a controlled back pressure is held on the returning drilling fluid in order to control the intrusion of formation fluids albeit in pressure drilling a limited amount of formation fluid is allowed to flow into the annulus.

27. In 1950, Mr. C. A. Langstaff disclosed (U.S. Patent No. 2,518,625, DX–27) a flow bean or choke for controlling the flow of producing oil wells. One specific object of Mr. Langstaff's device was "to provide a flow bean which has a relatively long life even when subjected to highly abrasive action of flow containing sand". Another object was to "provide a flow bean device in which the size of the orifice is automatically changed in consonance with the flow pressure of the well even under conditions tending to cause heading." Mr. Langstaff's flow bean included a rubber sleeve choking element for applying a back pressure on the well which sleeve was positioned to change the choke opening by a gas applied against it. In one embodiment shown in the Langstaff patent, the pressure applied from the well gas against the rubber sleeve to cause it to constrict equals the pressure of the well fluid entering the device. Defendant's expert testified that as the well fluid passed through the rubber sleeve in the Langstaff device, it increased in velocity and would be reduced in pressure so that the well gas applied to constrict the rubber sleeve could so function, and the device could hold a back pressure on the flow of fluid passing through the rubber sleeve. Another embodiment of Langstaff shows a force multiplier through which pressure greater than the well pressure can be caused to act against the rubber sleeve.

28. In 1959 Mr. Robert Welker disclosed (U.S. Patent 2,917,269, DX–30) a

flow regulator which could be installed in any desired transmission conduit to control the flow of a fluid passing through it. This device also included a rubber sleeve choking element and a remotely actuated hydraulic motor for causing the piston to expand outwardly and close a flow opening to cause a back pressure on the flowing fluid. Like the defendant's Swaco choke, the rubber sleeve in the Welker device is caused to move to change the flow opening by application of an end-wise force from a piston which is positioned by an external hydraulic fluid. The rubber sleeve element and the piston fluid motor are both mounted in the same housing through which the fluid to be controlled passes and the external hydraulic fluid is applied. Mr. Noble testified that with proper design, the Welker device could be utilized to control drilling fluid in the same manner as the accused Swaco choke.

29. Two other patents (Norman, U.S. Patent No. 2,735,642, DX–29 and Sausa, U.S. Patent No. 2,590,215, DX–28) were introduced by defendant and discussed by Mr. Noble in his testimony. Like the Langstaff and Welker devices, these devices show a rubber sleeve choking element and teach the use of an external hydraulic fluid to remotely operate the rubber sleeve element.

30. All these rubber sleeve valves are interchangeable with the accused Swaco choke insofar as the operating principles are concerned. Each shows a rubber sleeve choking element actuated by a fluid motor within a single housing into which the fluid to be controlled flows and into which an outside second fluid is directly introduced to vary the pressure on the controlled fluid. All are adapted to control the flow of abrasive fluids. As noted in f.f. 12, this is a use analogous to use of the Swaco choke to control the returning drilling fluid in a well control operation. For these devices to be employed for the specific use of drilling well control they would have to be properly engineered, for the patents themselves, like the Records patent in suit, convey only the basic ideas or

principles used. But the basic operating principles of the Swaco choke are all found in each of these references, DX–27, DX–28, DX–29, and DX–30.

31. Each of the elements of Mr. Records' patented structure were, in and of themselves, old in the art, and the novelty of his device lies in the overall combination of elements. Also, all the steps recited in Records' method claims 4 and 18 are old except the step of introducing pressure gas or fluid directly into the vessel to apply a back pressure to the drilling mud. Without the outside gas source connected to his vessel, Records' apparatus consisted of a known oilfield separator.

32. The O'Brien and Goins method of well control has already been discussed in f.f. 8. Significant to the consideration of method claims 4 and 18 is the fact that the accused Swaco choke, which employs the teachings of the four prior rubber sleeve valve patents, is used by defendant's customers in the practice of the O'Brien and Goins method of killing wells. Thus the conclusion that defendant's customers cannot practice this method without infringing these claims would require a conclusion that the patentees Langstaff, Welker, Norman and Sausa cannot use their devices in the O'Brien and Goins method, even though they are prior to Records and even though O'Brien and Goins introduced their method before Records. Plaintiff's method claims cannot be construed so broadly.

33. Plaintiff's expert, Dr. Pennington, took the position that the outer tubular housing of the Swaco choke was a vessel (as in claim 4) and a "chamber" (as in claims 13, 18, 20 and 21) in the same sense as the pressure vessel of Records' device into which both the drilling fluid and the external control fluid is applied, as it must be in Records' device. This construction of the words "vessel" and "chamber" as used in Records' claims 13, 18, 20 and 21 (f.f. 21) is not in keeping with the teaching of the Records' patent concerning the Records' pressure vessel. Even if the words

"vessel" and "chamber" were intended to be so construed, they would also read on the housings of DX–27, DX–28, DX–29, DX–30, DX–22–A and DX–22–B in which both the fluid to be controlled and the secondary fluid for controlling the flow is applied.

34. When the claims in suit are read and construed in light of the specification of the Records' patent (see f.f. 21), then they are different from the Cross and Teis devices and methods only in that the external pressure fluid (which is used in the Records' device only when the well is not making enough gas) is applied *directly* into a vessel for application directly on top of the drilling mud, as distinguished from an external fluid being introduced into the drilling mud prior to entering the vessel, as done in the Teis system. When the well is making gas in both the Cross and Records systems, the back pressure is provided by a co-action of the gas pressure relief valve and a drilling mud outlet valve. However, Cross does not attempt to maintain a present level of liquid whereas Records does by use of the float operated dump valve. It is thus clear that Records made only a slight improvement over the prior art and the scope of the invention is correspondingly narrow.

35. When the apparatus claims 20 and 21, and particularly the use of the word "chamber" therein, are construed as plaintiff asserts they should be, then these claims read directly on the four rubber sleeve valve patents (DX–27–30). The only theoretically possible literal difference is that the claims use the term "drilling" to modify the indicated use of the devices and the fluid which they are to control. However, as previously found in f.f. 12, the stated use of these prior devices in flow control of other abrasive fluids is entirely analogous to their use with drilling fluids. Testimony indicates that the Welker device (DX–30) related to the control of any fluid. These prior devices operate in the same manner to accomplish the same result as the Swaco choke no matter what fluid they control, and the patentees of DX–27, DX–28, DX–29 and DX–30 are entitled to all reasonably foreseeable uses of their devices.

36. If the words "pressure vessel" in plaintiff's method claim 4 and "chamber" in plaintiff's method claim 18 were construed as plaintiff asserts they should be, then these claims would read on any of the four prior art rubber sleeve valves (DX 27–30) when employed in the method of O'Brien and Goins to choke the flow of the drilling fluid in order to vary back pressure. For the reasons stated in f.f. 35, the stated use of these prior devices in flow control of other abrasive fluids is entirely analogous to their use with drilling fluids.

37. One skilled in the art is deemed by law to have knowledge of all relevant prior art and knowledge in existence at the time in question. In this particular instance, the time in question is the time when Records made his invention, i. e., September, 1960. Thus one skilled in the art would have knowledge of all the art cited by defendant as well as to all knowledge testified by the various witnesses as being in existence at this particular date. It was then within the skill of the art to apply rubber sleeve valves to various applications for the control of abrasive fluids. It was also within such skill to remotely control these and other types of valves. It was further within such skill to kill a well using the O'Brien and Goins method. One having the incentive to provide a remotely controlled choke for use in the O'Brien and Goins method would have all the necessary knowledge to do so. As further evidence of the validity of this conclusion, Mr. Griffin, in 1965, upon the request of a customer, quickly conceived the concept of generally using a rubber sleeve valve or choke operated by a remotely controlled hydraulic motor involving the subject matter plaintiff states is involved in its apparatus claims. There is no evidence that any of the other witnesses who testified, including Mr. O'Brien or Mr. Stockstill, ever attempted to design and develop a remotely controlled rubber sleeve valve for use in well control and for use in the

Goins and O'Brien method and failed in their attempts to do so. This is not to minimize what Mr. O'Brien and Goins did do prior to Mr. Records' work because they developed the method and procedure of well control that has become the standard in the industry. Also, although Mr. Griffin saw the Stooksberry unit prior to the time that he designed the accused Swaco choke, there is no evidence that Mr. Griffin used any information he could have obtained. Furthermore, there is nothing in Records' apparatus or in the patent in suit which would teach or suggest to those skilled in the art the use of the rubber sleeve choke orifice and the use of a remotely controlled fluid motor to operate it. Mr. Griffin called upon his past experience with rubber and its resistance to wear to develop the rubber sleeve. Plaintiff's own expert, Dr. Pennington, testified that to remotely control something would be a simple task. Also, the prior art remotely controlled rubber sleeve valve references (DX–27—DX– 30) are more relevant to the design of the accused device than the Records Apparatus.

38. There are a number of substantial differences between the patented Records' device as shown in the patent in suit and the accused Swaco choke. The Swaco choke and the plaintiff's patented structure accomplish the same ultimate result (i. e., apply a back pressure on the well fluid), as do the steel adjustable chokes and as would the prior art remotely operated rubber sleeve valves if used in the O'Brien and Goins method. However, substantial identity of structure in the Swaco choke and the device shown in the Record patent is not present. The following comparisons point up the differences in these devices and the similarity of the accused Swaco choke with the prior art Welker (DX– 30) and Langstaff (DX–27) references when used in a mud line (it being understood that Langstaff specifically uses well gas as the fluid for controlling his sleeve).

| Records Patent (Fig. 1) | Swaco | Welker & Langstaff |
|---|---|---|
| 1. Has a large, upright separator vessel confining both gas and mud in direct contact with each other and with the inside wall of the vessel. | Has a small horizontal tubular housing that helps confine hydraulic oil but does not confine mud—houses the working parts —returning mud and gas do not come into contact with it. | Same as Swaco. |
| 2. Vessel has separate outlets for well gas and mud. | Choke has only one outlet—both well gas and mud pass through this. | Same as Swaco. |
| 3. Has outside gas (e. g., nitrogen) inlet arranged to place such gas in direct contact with the mud. | Has hydraulic oil inlet to a piston-cylinder arrangement to keep oil out of contact with mud. | Same as Swaco. |
| 4. Has back pressure valve on well gas outlet to control back pressure on well when using well gas. | None—well gas not used to control with back pressure. | Welker same as Swaco. |
| 5. Has automatic pilot operated dump valve controlled by float in vessel to control outlet flow of mud to keep mud level above mud outlet and at constant level. | Has manually controlled hydraulically operated rubber sleeve to control outlet flow of both mud and gas. | Same as Swaco. |

39. Also, substantial identity of mode of operation of the Swaco choke and the device shown in plaintiff's patent is not present. Substantial identity of mode of operation does not exist simply because in both devices an external pressure is applied to get a back pressure on the well. The following comparisons of the modes of operation of the Swaco choke, the Records Fig. 1 embodiment and the prior art Welker (DX–30) and Langstaff (DX–27) references when used in a mud line illustrate the principal differences in modes of operation:

| Records (Fig. 1) | Swaco | Welker & Langstaff |
|---|---|---|
| 1. When the well makes gas, the gas is separated from mud to reduce mud velocity through the dump valve, thereby reducing abrasion on dump valve. Gas is separated from the mud, and this gas maintains the back pressure on the well and its pressure determines back pressure. | Well gas is never separated from the mud. There is no reduction of mud velocity or of abrasiveness of the mud on the rubber sleeve. Gas flows out with mud. The well gas is not used to maintain back pressure. | Same as Swaco. |
| 2. Outside gas (e. g., nitrogen) not used when well making enough gas. | Hydraulic oil always used even when well making gas. | Same as Swaco. |
| 3. Changes in rate of flow of fluids from well do not change desired back pressure. | Changes in rate change desired back pressure and unit must be manually adjusted to maintain desired back pressure. | Same as Swaco. |
| 4. Back pressure is maintained when flow from well stops. | Back pressure drops to zero when flow stops. | Same as Swaco. |
| 5. Outside gas directly generates and determines back pressure. | Hydraulic oil acts to position piston to determine choke size and this is its only function and, by itself, it has no influence on back pressure. | Same as Swaco. |
| 6. The separator vessel and dump valve combination permits accumulation of mud in lower portion of vessel on which gas pressure in upper part of vessel is directly applied in desired back pressure. | Mud and gas pass through the housing. The mud is not accumulated in the housing. The mud and hydraulic fluid are deliberately kept separate and can even be in two separate housings. | Same as Swaco. |
| 7. Dump valve and gas pressure relief valve co-act to maintain desired back pressure: the dump valve keeps a constant level of liquid in the separator vessel and the relief valve lets out excess gas. | It creates back pressure only by choking the flow of the drilling fluid. | Same as Swaco. |
| 8. Mud level in bottom of separator vessel forms a liquid seal to prevent loss of back pressure gas. | No fluid is accumulated, nor is there a liquid seal. | Same as Swaco. |

40. The significant and essential feature of Records' method is that it passes the returning drilling mud through a pressure vessel where it is slowed down to permit accumulation of mud in the vessel and separation of gas, if present, to hold a back pressure on the mud. Additional gas pressure is added in intimate contact with the mud if the separated gas is insufficient. Records thus employs two physical laws not employed by defendant: that which permits the separation of gas from the mud and that which makes it possible for gas of low solubility in the mud to be in intimate contact with the mud in the same pressure vessel to hold a back pressure on the drilling mud. This results in a predetermined back pressure independent of drilling mud flow rate being applied by the gas in the pressure vessel. The Swaco choke employs the same physical law as any choke (referred to as Boyles law) and utilizes a restriction and flow velocity to create a back pressure. The Swaco choke cannot apply a back pressure independent of flow rate. The hydraulic fluid has nothing to do with creating the back pressure: it acts merely to set the restriction of the choke orifice at a particular size. In the Swaco choke, a crew or an electric motor can be employed to position the piston to constrict the rubber orifice and the choke will hold a back pressure in the same manner as with the application of the external hydraulic fluid. However, in Records' structure, the presence of the secondary gas in the same vessel with the accumulated drilling fluid is essential and without it, his device will not work. Thus, the methods of using the Swaco choke and the plaintiff's patented structure use different physical laws.

41. Because Records patented invention and the accused Swaco device are not substantially identical in structure or mode of operation and because they do not involve the employment of the same physical laws, there has been no actual infringement by defendant of claims 4, 18, 20 and 21 of the patent in suit.

42. Claims 4, 18, 20 and 21, when properly construed in the light of the drawings and specifications of the patent in suit, (see f.f. 21) do not read on and are not infringed by the accused Swaco choke or its use in the O'Brien and Goins method of well control. When so construed, they require the outside fluid and mud to be in the same chamber so that they may be in direct contact with each other. In the Swaco choke, the outside fluid and mud are never in direct contact and are deliberately kept in separate locations.

43. Plaintiff DWC has fully complied with the constructive notice requirement of 35 U.S.C. § 287. Plaintiff also complied with 35 U.S.C. § 251 in applying for its reissue patent, No. 26,-220. Defendant had both actual and constructive notice of plaintiff's '220 patent and was invited to discuss a license under the patent before it had committed any of the acts plaintiff considers infringing on its '220 patent.

44. Defendant has asserted that it is entitled to the affirmative defense of intervening rights. This assertion is based upon the following allegations: (1) Prior to issuance of the patent in suit on June 6, 1967, Swaco, Inc. had manufactured approximately 190 of the Swaco chokes; (2) defendant acquired all of Swako's chokes (the 190 chokes made before June 6, 1967 and any additional chokes made from June 6, 1967 to December 1, 1967). The court has previously held defendant's offer of proof concerning the circumstances of defendant's acquisition of the Swaco choke business inadmissible. The defendant, in obtaining a court order precluding plaintiff's inquiry into the facts surrounding defendant's acquisition of this business from Swaco, Inc., for being irrelevant, abandoned any claim of intervening right dependent upon its acquisition of Swaco's business in these chokes. Because no other evidence was offered by defendant which would es-

tablish the defense of intervening rights, defendant has failed to satisfy its burden of proof on the issue. Even if the defendant's offer of proof concerning its acquisition of the Swaco chokes had been admitted, defendant would not have prevailed on the intervening rights defense. The validity of defendant's claimed intervening rights defense in the Swaco chokes would have depended upon defendant qualifying as Swaco, Inc.'s "successor in business" within the meaning of 35 U.S.C. § 252, the statute creating the right asserted. The court does not believe that to qualify as such a "successor in business" would require, necessarily, that the person or entity seeking to so qualify must have assimilated the entire corporate, or legal business existence of the predecessor, whether through merger, acquisition, etc. But the court is confident that one does not become such a "successor in business" by simply purchasing some of the assets of another business. Presumably, to qualify the "successor" must at least acquire a distinct line of the predecessor's business, including not only the assets of that line of business, but also the related obligations and liabilities. A witness of the defendant who testified in the offer of proof which was not admitted states that defendant acquired Swaco, Inc.'s choke business, without elaborating in greater detail about the nature of this acquisition. No evidence was included in the offer of proof which would indicate that there was anything more involved than the purchase of Swaco, Inc.'s assets. On this offer-of-proof, defendant's alleged status as Swaco, Inc.'s "successor in business" under 35 U.S.C. § 252 would not have been established. At a conference with the court after the conclusion of the trial, defendant's counsel stated that defendant did not wish to offer any additional evidence on this point.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and subject matter of this case and venue lies in the Houston Division of the Southern District of Texas.

2. The '220 patent fully complies with the requirements of Title 35 U.S.C. and was duly and lawfully granted. The invention defined by claims 4, 18, 20 and 21 of plaintiff's '220 patent was not anticipated by the prior art. The subject matter as a whole was not obvious to a person of ordinary skill in the art at the time the invention was made. The patent was not obtained through fraud or misrepresentation. United States Letters Patent No. Re. 26,220 and claims 4, 18, 20 and 21 thereof are valid.

3. Plaintiff's claim 13 is invalid and void for being overly broad and for including and covering subject matter not lawfully patentable under the Patent Laws of the United States in view of the state of the art pertaining thereto.

4. Defendant has not infringed any of claims 4, 13, 18, 20 and 21 of U. S. Letters Patent No. Reissue 26,220 as charged in plaintiff's First Amended Complaint.

5. Defendant has no intervening rights under 35 U.S.C. § 252.

6. The plaintiff is not entitled to an injunction against defendant, nor for an accounting because of this action.

7. The defendant is entitled to judgment in its behalf in accordance with the foregoing Findings of Fact and Conclusions of Law.

8. Costs of court shall be taxed against plaintiff.

9. Defendant is not entitled to an award of reasonable attorney fees pursuant to 35 U.S.C. § 285.

## ORDER

By reason of the foregoing, it is hereby ordered that judgment be entered for defendant wherein it is provided that:

(1) Claims 4, 18, 20 and 21 of the patent in controversy are valid;

(2) Claim 13 of the patent in controversy is invalid;

(3) The defendant has the right to manufacture, use and sell the apparatus of defendant and to practice its method here in controversy.

(4) Defendant's manufacture, use and sale of its apparatus and the practice of its method here in controversy has not been, and is not an infringement of any of claims 4, 13, 18, 20 and 21 of the patent here in controversy;

(5) Costs of court are taxed against the plaintiff.

Counsel for defendant shall submit an appropriate judgment.

## MEMORANDUM AND ORDER

At the conclusion of the trial of this cause, the court instructed both parties that any exceptions to the court's trial rulings on the evidence would be waived unless written exceptions were filed by motion and supporting brief within ten days after that date. The plaintiff asserted no exceptions to the court's trial rulings on the evidence. The defendant, however, has excepted, within the time granted and manner provided to two of the court's trial rulings.

One of the two objections raised by the defendant concerns the admissibility of the testimony of Mr. Stanley Stockstill, a witness called by plaintiff, as to the "obviousness" or "non-obviousness" of plaintiff's idea for a well-control device. Defendant asserts that Mr. Stockstill was not qualified by plaintiff to testify on such matters, and also, that the question of "obviousness" is one for the court to decide. "Evidence of obviousness is provided by the testimony of one of ordinary skill in the art." Cleveland Fabricating Co. v. Adsure, 298 F.Supp. 1275, 1282 (N.D.Ohio 1968). The plaintiff established that Mr. Stockstill was such a person and his testimony was indeed relevant to the issue of "obviousness." Accordingly, defendant's motion to strike the testimony of this witness must be denied.

In its second objection, defendant asserts that the court erred in its trial ruling that defendant's offer-of-proof on its alleged affirmative defense of "intervening rights" was inadmissible. Because defendant acquired the allegedly infringing well control devices from another corporation, Swaco, Inc., the validity of its claimed "intervening rights" in these devices depends upon defendant qualifying as Swaco, Inc.'s "successor in business" within the meaning of 35 U.S. C. § 252, the statute creating the "right" asserted. For this reason, plaintiff asserts that it propounded two interrogatories to defendant to obtain discovery relevant to the nature of defendant's acquisition of the Swaco devices: The first interrogatory inquired into the relationship of defendant to Swaco, Inc., and the second interrogatory asks that all correspondence in defendant's possession or control relating to defendant's acquisition of Swaco, Inc. be identified. To the first interrogatory, defendant answered "None" and to the latter defendant stated "Objected to as being irrelevant." Another judge of this court, in whose court the case was then filed, sustained defendant's relevancy objection. This court is of the opinion, and so finds, that when defendant, as proponent on the "intervening rights" issue, obtained the court order precluding inquiry into the facts surrounding defendant's acquisition of Swaco, Inc. or the accused chokes or related patent rights, defendant abandoned any claim of "intervening rights" it might otherwise have had by reason of its acquisition of Swaco's business in these chokes. Accordingly, defendant's motion on its Offer of Proof is denied.

Also before the court is a motion of the plaintiff to strike defendant's Post-Trial Brief. Plaintiff asserts that defendant's brief is oppressive, is predicated upon matters not of record, contains false and misleading statements and errs in its application of the law. The defendant's Post Trial Brief amounts to nothing more than written argument of counsel. The court is satisfied that this is not a situation where false or misleading representations have been intentionally made to the court. In view of the complicated nature of the

issues and evidence involved in this case, the court does not consider defendant's brief to be unreasonably long. Any matters contained in the briefs of counsel, that have not been introduced into evidence, and any other irrelevancies contained in these briefs will receive no consideration by the court. Accordingly, plaintiff's motion to strike will be denied.

By reason of the foregoing, it is hereby Ordered as follows:

(1) Defendant's motion to strike the testimony of Mr. Stockstill is in all things denied;

(2) Defendant's motion on its Offer-of-Proof is denied;

(3) All other objections to the evidentiary rulings of the court are waived; and

(4) Plaintiff's motion to strike defendant's Post Trial Brief is denied.